S06A0424. FINDLEY v. FINDLEY et al.
(629 SE2d 222)

BENHAM, Justice.

This Court granted the application for discretionary review filed by Norma Findley ("Wife") after the trial court denied Wife's petition for contempt, ruling that the estate of her late ex-husband was not obligated to make monthly alimony payments to Wife because the obligation to pay alimony did not survive the May 2004 death of the obligor Husband. The trial court also directed Wife to pay $500 attorney fees to the estate.

1. Where, as here, the parties to a divorce enter into a separation agreement that provides for the payment of alimony and the agreement is incorporated into the judgment and decree of divorce, the obligation to pay alimony terminates upon the death of the obligor spouse unless the incorporated settlement agreement contains a clear expression of intent to extend payments beyond the obligor's death. *Schartle v. Trust Co. Bank*, 239 Ga. 248, 249 (236 SE2d 602) (1977). Thus, in order for Wife to successfully impress upon her former husband's estate the obligation to pay alimony until Wife dies or remarries, the settlement agreement must contain a clear expression of the parties' intent that the obligation to pay alimony was not to terminate upon the death of the obligor Husband.

The Findleys' settlement agreement incorporated into their 1975 final judgment and decree of divorce provided that Husband was to pay Wife alimony of $500 per month until she died or remarried; Husband was to pay for the automobile Wife had in her possession

---

[5] Our decision renders it unnecessary to consider the effect of Ray's failure to post the ordered supersedeas bond.

and to transfer title to her when payments were completed; and Husband was to pay the note owed by Wife for furniture she had purchased. The agreement stated the alimony payment was to terminate upon Wife's death or remarriage, but neither death nor remarriage eliminated the obligation to pay for the car and furniture. The furniture was to remain the property of Wife or her estate without regard to the death of either Husband or Wife; however, if Wife pre-deceased Husband, Husband would retain title to the car. Elsewhere in the settlement agreement Wife was given the right to live in the marital home which was owned by Husband so long as she did not remarry and she occupied the house during the months of the usual school year. The agreement expressly provided that Wife's right to occupy the home survived the death of Husband.

A clear expression of intent to have the alimony obligation survive the death of the obligor was found in *Franklin v. Franklin*, 256 Ga. 61 (344 SE2d 230) (1986), where an incorporated settlement agreement provided that the obligor's monthly alimony payments were to continue until the former spouse died or remarried and were "a charge against the estate of [the obligor]." The settlement agreement also stated that "each and every item and condition of the agreement are made charges against the estate of both parties if the same has not been completed upon the death of either party." See also *Brooks v. Jones*, 227 Ga. 566, 567 (181 SE2d 861) (1971) (an incorporated settlement agreement required Husband to keep in force life insurance policies on his life with his daughters as beneficiaries and stated "in the event of husband's death the said agreement becomes equally binding on his executor . . . and to the same extent and for the same purposes. The said executor . . . is to fulfill all the obligations of this contract. . . ."). The incorporated agreement in the case at bar expressly provides that Husband's obligation to pay the car and furniture debts survives death, and Wife's right to live in the marital home owned by Husband expressly survives the death of Husband, but no such express provision was made with regard to the payment of periodic alimony.

In her effort to establish a clear expression of intent to have the alimony obligation survive the obligor's death, Wife relies on the portion of the incorporated settlement agreement which states the payment of alimony "shall continue until she dies or remarries." In *Dolvin v. Dolvin*, 248 Ga. 439, 441 (284 SE2d 254) (1981), this Court held that such language in an agreement which is silent as to the effect of the obligor's death on the alimony obligation does not evidence the necessary "manifest intention of the parties to reverse the normal rule that the death of the [obligor] terminates [the] obligation to pay alimony." See also *Schartle v. Trust Co. Bank*, supra, 239 Ga. 248. In so doing, the *Dolvin* court expressly overruled the

plurality decision in *Ramsay v. Sims*, 209 Ga. 228 (71 SE2d 639) (1952), which held that the alimony obligation in an incorporated settlement agreement survived the death of the obligor if the incorporated settlement agreement stated a definite time for performance, i.e., the majority of the minor child or the death or remarriage of the supported spouse. Wife acknowledges *Ramsay* has been overruled, but argues it is applicable to the case at bar because it was in effect at the time the judgment of divorce incorporating the settlement agreement was entered.

Generally, court rulings that substantially alter law apply retroactively. *Banks v. ICI Americas*, 266 Ga. 607 (2) (469 SE2d 171) (1996); *Gen. Motors Corp. v. Rasmussen*, 255 Ga. 544 (2) (340 SE2d 586) (1986). See also *Harper v. Virginia Dept. of Taxation*, 509 U. S. 86, 94 (113 SC 2510, 125 LE2d 74) (1993) ("Nothing in the Constitution alters the fundamental rule of 'retrospective operation' that has governed 'judicial decisions for near a thousand years.' [Cit.]"). However, this Court has recognized that rulings in civil cases may be applied prospectively if to give them retroactive effect "would unjustifiably disrupt existing relationships, . . . especially . . . where there [was] good faith reliance" on the law as it previously existed (*Allan v. Allan*, 236 Ga. 199, 207-208 (223 SE2d 445) (1976)), or, "because of the nature of the [former rule], unjust results would accrue to those who justifiably relied on it." *Strickland v. Newton County*, 244 Ga. 54 (1) (258 SE2d 132) (1979). In *Flewellen v. Atlanta Cas. Co.*, 250 Ga. 709 (3) (300 SE2d 673) (1983), this Court employed the three-pronged test enunciated by the U. S. Supreme Court in *Chevron Oil Co. v. Huson*, 404 U. S. 97 (92 SC 349, 30 LE2d 296) (1971), to determine whether a judicial decision should be applied prospectively.[1] *Chevron Oil* authorizes modification of the rule of "full retroactivity" (i.e., application of a newly-pronounced rule to the parties before the Court and to all others by and against whom claims may be pressed, consistent with res judicata and procedural bars) and permits a court to apply "modified" or "selective" prospectivity to a new rule by applying the new rule to the facts of the case in which the rule is pronounced, and

---

[1] As set forth in *Flewellen*, supra, 250 Ga. at 712, the three prongs of *Chevron Oil* require a court to:

(1) Consider whether the decision to be applied nonretroactively established a new principle of law, either by overruling past precedent on which litigants relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed. (2) Balance . . . the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation would further or retard its operation. (3) Weigh the inequity imposed by retroactive application, for, if a decision could produce substantial inequitable results if applied retroactively, there is ample basis for avoiding the injustice or hardship by a holding of nonretroactivity.

then returning to the old rule with respect to other litigants in similar situations whose cases arise on facts that pre-date the pronouncement of the new rule. *James B. Beam Distilling Co. v. Georgia*, 501 U. S. 529, 535-537 (111 SC 2439, 115 LE2d 481) (1991), reversing *James B. Beam Distilling Co. v. State of Ga.*, 259 Ga. 363 (2) (382 SE2d 95) (1989). See, e.g., *Gen. Motors Corp. v. Rasmussen*, supra, 255 Ga. at 546-547; *Federated Mut. Ins. Co. v. DeKalb County*, 255 Ga. 522 (341 SE2d 3) (1986); *Gainesville Financial Svcs. v. McDougal*, 154 Ga. App. 820, 821-823 (270 SE2d 40) (1980); *FinanceAmerica Corp. v. Drake*, 154 Ga. App. 811, 817-818 (270 SE2d 449) (1980).

In *Harper v. Virginia Dept. of Taxation*, supra, 509 U. S. at 96, the U. S. Supreme Court pointed out that a majority of Justices in *James B. Beam Distilling Co. v. Georgia*, supra, 501 U. S. 529, had adopted a rule requiring the retroactive application of a civil decision involving a rule of federal law. The *Harper* Court went on to hold that in all cases still open on direct review "full retroactive effect" must be given to a rule of federal law announced by the Court in a case and applied to the parties therein. *Harper*, supra, 509 U. S. at 97. In so doing, the Court effectively abandoned *Chevron Oil v. Huson* by banning, when the Court had applied a new rule to a case, the "selective application of new rules" and "prohibit[ing] the erection of selective temporal barriers to the application of federal law in noncriminal cases." Id. The Court believed it could "scarcely permit 'the substantive law (to) shift and spring' according to 'the particular equities of (individual parties') claims' of actual reliance on an old rule and of harm from a retroactive application of the new rule" because the Court did not have constitutional authority " 'to disregard current law or to treat similarly situated litigants differently.' " Id.

While the Court required in *Harper* that state courts adjudicating federal law give full retroactive effect to a rule of federal law announced and applied to parties to a controversy, the Court also recognized that state courts had freedom to limit the retroactive operation of their own interpretations of state law (id. at 100), citing *Great Northern R. Co. v. Sunburst Oil & Refining Co.*, 287 U. S. 358, 364-366 (53 SC 145, 77 LE 360) (1932). In *Sunburst Oil*, the Court stated

> the federal constitution has no voice [on] the subject [of a state court's refusal to make its ruling retroactive]. A state in defining the limits of adherence to precedent may make a choice for itself between the principle of forward operation and that of relation backward. It may say that decisions of its highest court, though later overruled, are law none the less for intermediate transactions. . . . [N]ever has doubt been expressed that it *may* so treat them if it pleases, whenever

injustice or hardship will thereby be averted. [Cits.] On the other hand, it may hold to the ancient dogma that the law declared by its courts had a Platonic or ideal existence before the act of declaration, in which event the discredited declaration will be viewed as if it had never been, and the reconsidered declaration as law from the beginning. The alternative is the same whether the subject of the new decision is the common law [cit.] or statute. [Cits.] The choice for any state may be determined by the juristic philosophy of the judges of her courts, their conceptions of law, its origin and nature. We review not the wisdom of their philosophies, but the legality of their acts.

Since the Supreme Court's decision in *Harper*, several state appellate courts have re-examined their use of the flexible *Chevron Oil* test with regard to the prospectivity of new state law decisions. See *Dempsey v. Allstate Ins. Co.*, 325 Mont. 207, 217 (104 P3d 483) (2004) (*Chevron* test still viable as an exception to the rule of retroactivity, but exception will only be invoked when all three *Chevron* factors are satisfied); *Christy v. Cranberry Volunteer Ambulance Corps*, 579 Pa. 404, 418-419 (856 A2d 43) (2004) (while *Harper* decision caused *Chevron Oil* to lose its hold as the dominant approach for retroactive application of new decisions in current civil cases, it strengthens the general principle that changes in law are to be applied retroactively to pending cases; however, retroactive application is a matter of judicial discretion and must be exercised on a case-by-case basis, making a sweeping rule of retroactive application unjustified); *Estate of Ireland v. Worcester Ins. Co.*, 149 N.H. 656, 660 (826 A2d 577) (2003) (*Chevron* test will no longer be applied because to permit the substantive law to shift and spring according to particular equities of parties' claims of actual reliance on old rule and of harm from retroactive application compromises the value the court places upon stability in legal rules; furthermore, selective prospectivity of new rules only compounds the challenge to the stabilizing purpose of precedent posed by the development of the "new" rule); *City of New Bern v. New Bern-Craven County Bd. of Ed.*, 338 N.C. 430, 442-443 (450 SE2d 735) (1994) (because the issue is one of state law, the court applies a test of "reasonableness and good faith" to determine the effect which a judicial decision holding a statute unconstitutional will have on the rights and obligations of parties who have taken action pursuant to the invalid statute); *Beavers v. Johnson Controls World Services*, 118 N.M. 391, 398 (881 P2d 1376) (1994) (Due to "the compelling force of the desirability of treating similarly situated parties alike," the court adopted a presumption of retroactivity for a new rule imposed by a judicial decision, which presumption can be

overcome by an express declaration in the judicial decision that the rule is intended to operate with selective prospectivity or, in the absence of such a declaration, by "a sufficiently weighty combination of one or more of the *Chevron Oil* factors. . . ."); *Montells v. Haynes*, 133 N.J. 282 (627 A2d 654) (1993) (the state supreme court recognizes that New Jersey's approach "roughly parallels" that of *Chevron Oil* and the court continues to adhere to the belief that, in an appropriate case, a purely prospective application may provide the fairest and most equitable disposition); *Martin Marietta Corp. v. Lorenz*, 823 P2d 100, 113, n. 7 (Colo. 1992) (Colorado will continue to adhere to the *Chevron Oil* analysis in resolving issue of retroactivity or prospectivity of state judicial decisions); *In re Commitment of Thiel*, 241 Wis.2d 439 (625 NW2d 321) (Wis. App. 2001)[2] (declining to follow *Harper* because it applies only to federal law; a radical change in the manner in which the state's appellate courts approach retroactivity analysis is within the exclusive superintending authority of the state supreme court; and it is within the inherent power of the state supreme court to give a decision prospective or retrospective application without offending constitutional principles).

Both prior to and following the entry of the three-pronged *Chevron Oil* test into this Court's jurisprudence in *Flewellen*, supra, 250 Ga. 709, this Court expressed a juristic philosophy that recognizes there are compelling exceptions to the general rule that judicial decisions apply retroactively. In some judicial decisions in which a new rule was announced, we made it clear the new rule was to apply prospectively by stating the new rule was not applicable to the case in which it was announced and would apply only to actions taken on or after a specified future date. We did so because "parties have been justified in their reliance" upon a previous judicial construction (*Varn v. Varn*, 242 Ga. 309 (248 SE2d 667) (1978); *Tolbert v. Duckworth*, 262 Ga. 622 (423 SE2d 229) (1992); *Daopoulos v. Daopoulos*, 257 Ga. 71 (354 SE2d 828) (1987)); or because prospective effect served the interests of justice when an issue of first impression not clearly foreshadowed was decided. *Eckles v. Atlanta Technology Group*, 267 Ga. 801 (2) (485 SE2d 22) (1997). See also *McDaniel v. Elliott*, 269 Ga. 262 (497 SE2d 786) (1998); *Trend Dev. Corp. v. Douglas County*, 259 Ga. 425 (383 SE2d 123) (1989).

Our case law reflects we have also declined to give retroactive effect to a judicial decision when the particular equities of a subsequent case establish that selective prospectivity (i.e., the new rule is applied to the case in which it is announced and the former rule is

---

[2] The Wisconsin Supreme Court has yet to address the issue. See *State ex rel. Brown v. Bradley*, 259 Wis.2d 630 (658 NW2d 427) (2003).

applied to other litigants in similar situations whose cases arise on facts that pre-date the pronouncement of the new rule) is more just. Where, keeping in mind the nature of the former rule of law and its previous application, application of the new rule would cause unjust results on those who justifiably relied on the old rule, we have chosen to apply the old rule. See, e.g., *Walker v. Walker*, 247 Ga. 502, 503 (277 SE2d 45) (1981) (involving educational trust fund in a divorce decree); *Strickland v. Newton County*, 244 Ga. 54 (258 SE2d 132) (1979) (involving a local option sales tax ruled illegal); *Allan v. Allan*, supra, 236 Ga. 199 (involving statutory year's support). At times, we and the Court of Appeals have employed the three-pronged test of *Chevron Oil* to deny retroactive effect to a new principle of law in order to avoid injustice or hardship on parties who justifiably relied on the former principle without unduly undermining the purpose and effect of the new principle. See *Federated Mut. Ins. Co. v. DeKalb County*, supra, 255 Ga. 522 (liability of insurance companies for back taxes); *Gainesville Financial Svcs. v. McDougal*, supra, 154 Ga. App. at 821-823 (Georgia Industrial Loan Act); *FinanceAmerica Corp. v. Drake*, supra, 154 Ga. App. at 817-818 (Georgia Industrial Loan Act). In essence, *Chevron*'s three-pronged test is a set of criteria similar to that which we had been using to deny retroactivity when retroactivity would cause unjust results to those who had justifiably relied on the former rule of law.

Our survey leads us to conclude that the juristic philosophy of this State is more consistent with that expressed in *Chevron Oil* than that of *James B. Beam Distilling Co. v. Georgia*, supra, 501 U. S. 529, and *Harper v. Virginia Dept. of Taxation*, supra, 509 U. S. 86. Accordingly, we decline to adopt a rule of universal retroactivity in all civil cases. Instead, we shall continue to apply the general rule that a judicial decision announcing a new rule is retroactive unless the decision itself expressly makes it a matter of pure or selective prospectivity or, after examining whether retroactive application would adversely affect operation of the new rule and weighing the inequity imposed by retroactive application, we subsequently conclude application of the new rule would cause unjust results to those who justifiably relied on the former state of the law. In so doing, the criteria set out in *Chevron Oil* may be employed.

We now turn to the legal issue before us in the current case — whether this Court's 1981 decision in *Dolvin v. Dolvin* should be applied retroactively to the Findleys' incorporated settlement agreement entered in 1975. In *Dolvin*, this Court noted the two lines of cases concerning the language necessary in an incorporated settlement agreement to have a support obligation survive the death of the

obligor: in the 1951 plurality opinion in *Ramsay*,[3] a statement in the settlement agreement of a definite time of performance (i.e., majority of the child or the marriage or death of the supported spouse) was found to be an expression of the parties' intent that the support obligation survived the death of the obligor spouse; in contrast was the 1977 decision in *Schartle v. Trust Co. Bank*, supra, 239 Ga. at 249, where the Court ruled an incorporated settlement agreement's provision for payment of alimony did not survive the death of the obligor spouse unless the settlement agreement contained language indicating a clear intent to do so, and concluded that the language "until the wife shall die or remarry, whichever event shall occur first," did not meet that standard. *Dolvin* expressly overruled *Ramsay* because the *Dolvin* court found "the boilerplate language" used in the Ramsay settlement agreement ("until the wife shall die or remarry, whichever event shall occur first") did not evince "a manifest intention of the parties to reverse the normal rule that the death of the [obligor] terminates [the] obligation to pay alimony so that an agreement which is silent as to the [obligor's] death creates by its boilerplate regarding the [supported spouse] an obligation on [the obligor's] estate to continue to pay alimony." *Dolvin v. Dolvin*, supra, 248 Ga. at 441.

We first note the lack of express language of prospectivity in *Dolvin*. Compare *Varn v. Varn*, supra, 242 Ga. 309; *Daopoulos v. Daopoulos*, supra, 257 Ga. 71. See *Otis Elevator Co. v. Tanner*, 208 Ga. App. 417, 418 (430 SE2d 663) (1993) (where the Court of Appeals viewed the absence of an expression of prospectivity as an indication of this Court's intention that the new rule be given retroactive effect). Secondly, the *Dolvin* Court's application of its holding to the Dolvins' 1968 incorporated settlement agreement was, itself, a retroactive application of its holding. See also *Schartle v. Trust Co. Bank*, supra, 239 Ga. at 249 (this Court made the same finding as the *Dolvin* Court and applied its ruling to a 1970 incorporated settlement agreement despite the recipient spouse's reliance on *Ramsay v. Sims*); *Estate of Peacocke v. Peacocke*, 694 S2d 1252, 1254-1255 (Miss. 1997) (the Supreme Court of Mississippi, faced with a 1972 Georgia divorce decree incorporating a settlement agreement, applied *Dolvin* retrospectively after concluding the law of Georgia was to do so). Finally,

---

[3] Two Justices joined the opinion, one Justice concurred in judgment only, one Justice did not participate, and two Justices concurred specially on the ground that they believed alimony was a money judgment that became a charge against the estate of the obligor spouse since the object of the law providing for alimony was to support the recipient spouse and it was inequitable that the supported spouse had been deprived of the right of inheritance, dower, and year's support by an award of alimony that would terminate upon death of the obligor spouse. See *Berry v. Berry*, 208 Ga. 285, 293-294 (66 SE2d 336) (1951) (dissenting opinion).

we conclude that any reliance the Findleys placed on the *Ramsay* decision in drafting their settlement agreement cannot be considered "justifiable," and any inequity imposed on Mrs. Findley by retroactive application of *Dolvin* to her incorporated settlement agreement does not arise to the "substantial inequitable results" that amounts to the injustice or hardship that would authorize a holding of nonretroactivity. See *Flewellen*, supra, 250 Ga. at 712. The *Ramsay* opinion was a plurality opinion, held by a minority of the Justices of the Court, which set itself out as an exception to the general rule that a recipient spouse's claim for alimony terminated upon the death of the obligor spouse. The pool of persons who could benefit from a ruling in 2006 that the 1981 *Dolvin* opinion was inapplicable to settlement agreements incorporated into judgments entered prior to 1981 is, in all likelihood, small in number, and the lack of litigation on this issue (three appellate cases since 1977) leads us to conclude that retroactive application of *Dolvin* will not result in "substantial inequitable results." See *Gen. Motors Corp. v. Rasmussen*, supra, 255 Ga. at 546 (looking beyond the situation of the litigants at bar to determine whether retroactivity is inequitable). Consequently, we decline to depart from the general rule of retroactivity of judicial decisions and conclude *Dolvin* is to be applied retroactively. Since the provision that Wife was entitled to alimony until she remarried or died does not evidence a manifest intention to reverse the normal rule that the death of the obligor terminates the obligation to pay alimony (*Dolvin v. Dolvin*, supra, 248 Ga. at 441), and there is nowhere in the Findleys' incorporated settlement agreement a clear expression of intent to extend alimony payments beyond the death of the obligor spouse, the trial court did not err when it denied Wife's motion to hold the estate of Husband in contempt for its failure to take on Husband's alimony obligation.[4]

---

[4] Wife also contends the trial court's 1983 order resolving contempt/declaratory judgment actions between the parties established that the alimony obligation terminates only upon Wife's death or remarriage. The issue in 1983 was whether Husband was entitled to proration of the monthly alimony obligation (which at that time included support for minor children) upon the minor children reaching majority. The 1983 trial court ruled that an award of permanent alimony made jointly to a spouse and to minor children was considered indivisible and not subject to reduction in proportion as the children reached majority, died, became emancipated, or were placed in the custody of the obligor spouse. In deciding the issue, the trial court reached "the inescapable conclusion . . . that so long as the wife has not remarried, there is no termination or abatement of the alimony payments required **due to any change in the status of the children.**" (Emphasis supplied.) While the trial court's order stated Husband was responsible for payment of $500 alimony monthly to Wife until she died or remarried, it also noted in a statement of the applicable law that "the undivided award would continue until the remarriage of the spouse awarded the alimony or until the death of **either** party." (Emphasis supplied.) 1983 order, p. 10. Since the issue in 1983 was not whether Husband's alimony obligation survived his death and the trial court's order did not mention Husband's estate as a potential payor of alimony until Wife died or remarried, we do not read the 1983 order as

2. Wife also takes issue with the trial court's award of attorney fees to the estate. In its order dismissing the petition for contempt, the trial court granted the estate's counterclaim and awarded the estate $500 as attorney fees. The estate had sought fees pursuant to OCGA §§ 9-15-14 (b) and 19-6-2 in its counterclaim and had filed an OCGA § 9-15-14 (b) motion for attorney fees during the litigation. The trial court's order contained no information concerning the basis for the trial court's award.

OCGA § 9-15-14 (b) authorizes an award of "reasonable and necessary" attorney fees upon a finding that an action or any part thereof "lacked substantial justification, . . . was interposed for delay or harassment, or . . . an attorney or party unnecessarily expanded the proceeding by other improper conduct. . . ." If the award of attorney fees to the estate was predicated on OCGA § 9-15-14 (b), it was error to do so because the findings necessary to support such an award were not made. *Moon v. Moon*, 277 Ga. 375, 378 (6) (589 SE2d 76) (2003). OCGA § 19-6-2 (a) (1) authorizes the grant of attorney fees in an action for contempt of court arising out of a divorce and alimony case "[w]ithin the sound discretion of the court, except that the court shall consider the financial circumstances of both parties as a part of its determination of the amount of attorneys fees, if any, to be allowed against either party. . . ." The purpose of an award pursuant to OCGA § 19-6-2 is "to ensure effective representation of both spouses so that all issues can be fully and fairly resolved." *Johnson v. Johnson*, 260 Ga. 443, 444 (396 SE2d 234) (1990). It is not predicated upon a finding of misconduct, and the record must contain evidence the parties' financial circumstances were such that the $500 attorney fee award was to ensure that the estate could afford effective representation. *Moon v. Moon*, supra, 277 Ga. at 379 (6), n. 4. If the trial court based its attorney fee award on OCGA § 19-6-2, it was error to do so because there is no evidence of the parties' financial circumstances that authorizes such an award. Id. Accordingly, the attorney fees award is reversed. Id.

*Judgment affirmed in part and reversed in part. All the Justices concur.*

DECIDED APRIL 25, 2006.

*Tommy J. Smith*, for appellant.

construing the incorporated settlement agreement as providing for the payment of alimony by Husband's estate until Wife died or remarried.

*Dubberly & McGovern, B. Daniel Dubberly III, David H. Womack,* for appellees.